UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLES HUIZINGA,

        Plaintiff,

                                      CASE NO. 1:10-CV-223

v.

                                        HON. ROBERT J. JONKER

GENZINK STEEL SUPPLY & WELDING CO.,
KEN GENZINK, and DON GENZINK,

        Defendants.

_____/

## OPINION AND ORDER

        Charles Huizinga was Chief Financial Officer ("CFO") of Genzink Steel Supply and Welding Company ("Genzink Steel" or "Company") for less than a year before he was fired. Genzink Steel says it fired him because he did not fit into the company's team-oriented corporate culture, but Huizinga says he was fired in retaliation for complaints about the Company's 401k program, in violation of § 510 of ERISA. The parties elected, and the Court conducted, a bench trial on that issue. The Court also conducted a bench trial on the remedial issues raised by the Court's earlier order of summary judgment (doc. # 155) in favor of Huizinga and against Defendants Don and Ken Genzink for breach of their ERISA-imposed fiduciary duties. This opinion constitutes the Court's findings of fact and conclusions of law on all triable issues under Rule 52.

## I.    FINDINGS OF FACT

### A.    Genzink Steel's Team Culture

        Genzink Steel is a Michigan-based steel company. Its founder, Don Genzink, started the Company as a small, family-owned business. Don's son, Ken Genzink, grew up in the Company,

working in various departments until finally taking over as Genzink Steel's president on Don's retirement. Under both Don and Ken Genzink, the Company consistently emphasized the same collaborative, team-oriented culture, even as it grew larger through the years. Under Ken, day-to-day management of the Company was left largely to a group of long-term Genzink Steel employees known as the Executive Team. Ken Genzink, himself, took a largely hands-off approach to managing the Company, relying almost entirely on the Executive Team to handle day-to-day decisions. Before Huizinga was hired, the Executive Team functioned with cohesion, comradery, and mutual respect.

### B. Huizinga Disrupts the Team

In early 2009, Genzink Steel was experiencing significant economic challenges. The Company's CEO, Neil VanRegenmorter, believed a full-time CFO was necessary to navigate troubled economic times, and the Executive Team agreed. After a brief search, the Company hired Charles Huizinga.

Almost immediately, Huizinga began butting heads with his new colleagues and the outside contractors who worked with Genzink Steel. At trial, Genzink Steel's Benefits Coordinator, Darlene Alviar, testified that Huizinga had stormed out of a meeting with Bob Sprotte, the Company's long-time health insurance agent, without saying a word. Mary Pathuis, then the Company's Information Technology Manager, similarly testified that Huizinga was combative and impolite at subsequent meetings with Sprotte. Alviar and Pathuis both reported that, at employee meetings, Huizinga was frequently rude and dismissive, and that he would often sit looking away from the other employees or abruptly leave meetings without explanation. The problems were not limited to mid-level employees like Alviar and Pathuis. The members of the Executive Team experienced the same problems. Several members of the Team testified in convincing detail about their experiences. In

addition, the Comapny's long-term CPA testified about receiving a profanity-laced tirade from Huizinga concerning a bill. All agreed that Huizinga's mercurial temperament and disrespectful conduct negatively affected them in performing their jobs, seriously disrupted the Company's team-oriented culture at a time when that culture was most needed, and hampered long-term relationships with trusted outside service providers.

Huizinga also orchestrated or made employment decisions that were disruptive to both the Executive Team and the middle-management personnel at Genzink Steel. First, in early 2009, he pushed VanRegenmorter to fire Bob Angeli, Genzink Steel's longtime plant manager and a member of the Company's Executive Team. Later, he advocated for the firing of John Maxson, and almost achieved it before Ken Genzink got wind of the decision and vetoed it as "ridiculous." Finally, numerous witnesses testified at trial that Huizinga was the driving force behind the decision to fire Debra Orchard, the Company's Human Resources Manager.[1] At trial, every witness, except Huizinga, reported that the decisions were corrosive to Genzink Steel's "team first" management culture. Even Huizinga recognized the disruptions were real, but rationalized that the changes were necessary given economic circumstances. At a minimum, all agreed the unilateral decision-making was directly contrary to the Company's history and culture. That these decisions--and the manner in which they were made--were contrary to the interests and general tenor of Genzink Steel is evidenced by what happened after the Company fired Huizinga: Angeli was rehired, full-time, as the Company's plant manager just a month after Huizinga was fired; Orchard was also asked to return

---

[1] According to Orchard, Huizinga's interactions with her went beyond simple disrespect and crossed the line into overt sexual harassment. Huizinga denies the claim. It is not necessary for purposes of this case to resolve the issue, but the Court notes that Orchard's account of the encounter in the office was entirely credible.

to the Company after Huizinga was fired; and VanRegenmorter--Huizinga's only ally during his stint at Genzink Steel--resigned or retired the month after Huizinga's termination.

Employee dissatisfaction with Huizinga was so pervasive that, in June 2009--just six months into Huizinga's tenure--several mid-level managers at Genzink Steel set up a meeting with VanRegenmorter to voice their concerns about Huizinga's interactions with other employees and his role in managing the Company. At the meeting, a number of longtime Genzink Steel employees told VanRegenmorter that Huizinga was a poor fit for the Company and recommended that he be fired or at least have his responsibilities diminished. When VanRegenmorter asked the attendees to identify positive things about Huizinga, no one did so. Nevertheless, VanRegenmorter declined to take any action against Huizinga as a result of the meeting. Employees decided VanRegenmorter was backing Huizinga, so they stopped bringing their concerns to him and simply tried to make the best of it. After the meeting, however, Huizinga continued to cause problems for Company employees. In July 2009, for example, he attended a meeting with Alviar, Pathuis, and another Genzink Steel employee, Kevin Palmbos. According to Pathuis and Alviar, Huizinga screamed at Alviar at the meeting in a manner that both women found threatening and totally inappropriate. Several months later, in November 2009, Huizinga and VanRegenmorter terminated Alviar, along with Orchard. Ken Genzink was not consulted about either decision.

C.    **The December 2009 Meeting**

All the problems with Huizinga came to a head in early December 2009, shortly after Ken Genzink returned from extended foreign travels. While Huizinga was creating ill will toward himself among the management team (except, possibly, with VanRegenmorter), he was becoming increasingly frustrated with the management of the Company's 401k plan ("the Plan"). Almost from

the moment he was hired as CFO, Huizinga had problems with the way the Plan was administered. Initially, he expressed concern that Ron Roti, a longtime friend of the Genzink family, was serving both as the Plan's compensated third-party administrator and as a member of Genzink Steel's board of directors. Huizinga became further concerned about Roti's administration of the Plan when employees reported to him that Roti's presentations to Plan participants were inadequate, depressing, and oftentimes amounted to nothing more than rants about macroeconomic and political events.

Huizinga's concerns about Roti's administration of the Plan were exacerbated in the spring of 2009, when he tried to gather information about Roti's fees as part of an evaluation of whether to replace Roti with a different administrator. In early 2009, Genzink Steel needed to find a new commercial lender. Ultimately, the Company reached a lending agreement with Fifth Third Bank. Huizinga played a significant role in brokering the new agreement, relying largely on his preexisting relationships with Fifth Third personnel to get the deal done. One condition of the agreement was that Fifth Third be allowed to compete for the role of third-party administrator for the Plan. In preparing its Plan administration proposal, Fifth Third wanted certain information about the Plan, including information about the number of participants in the Plan, the amount of funds in the Plan, and the fees charged by Roti in administering the Plan. When Huizinga tried to obtain the information for Fifth Third, however, he found Roti and his assistant, Maryalyce Skree, resistant. Both Huizinga and Fifth Third asked Roti and Skree for the information, but neither was able to obtain it.[2]

---

[2] At trial, Ken Genzink suggested for the first time in this litigation that it would have been improper for Roti to disclose the fees--or at least for Fifth Third, as a competitor, to have the information. There are multiple problems with this theory. First, it has never before been asserted in this case. Second, the whole point of the Roti spreadsheet was to compare fees and services among possible providers. If there was any impropriety in the fee disclosures, it was in Roti's refusal to play

The resistance to fee disclosure continued right up to the time of Fifth Third's presentation in December. Roti never made a full disclosure of the compensation he received from the Plan as third-party administrator or otherwise--not to Huizinga, Fifth Third, or anyone else at Genzink Steel. The issue got personal for Huizinga when his personal Plan statement revealed a drop in the balance for his Plan account, even though he was fully invested in a money market fund that reported a positive return for the period.[3] How could Huizinga be fully invested in an investment showing a positive return and still experience a loss in his account? He suspected the Plan was paying undisclosed fees to Roti.[4] Huizinga pressed the issue, not just with Roti, but with other people at the Company, including VanRegenmorter and Ken Genzink himself. Nevertheless, neither Roti nor anyone else ever provided Huizinga with complete or satisfactory disclosures to answer his questions. Indeed, even at summary judgment in this case, Defendants collectively failed to account for the fees and other compensation to the Court's satisfaction.

---

by the same rules as all the other potential providers and provide a completely transparent picture of his own compensation. Finally, in the context of the fiduciary responsibility ERISA imposes on the Genzinks in deciding which service provider to select, full and transparent disclosure is the only possible process, especially when one of the competitors--Roti--is already a board member of Genzink Steel and a family friend of the Genzinks.

[3] The Defendants devoted considerable effort to demonstrating that it is possible for money market funds to lose money. That argument is a red herring. Money markets do not ordinarily fall below their par value, but no one disputes that it is possible. The point here is that the particular fund in which Huizinga invested reported positive earnings for as long as Huizinga was holding it, meaning there was no rational explanation for why his account lost value while the investment returns for the fund were positive.

[4] The issue of undisclosed – or poorly disclosed--fees on 401k plans is emerging as an important problem under ERISA. Huizinga was correct to shed light on the problem at the Company. *See generally* Quinn Curtis & Ian Ayres, *Measuring Fiduciary and Investor Losses in 401(k) Plans* (Yale University, Working Paper), *available at* http://www.law.yale.edu/documents/pdf/cbl/CurtisAyres_401kFees(1).pdf.

Huizinga's frustration bubbled into the open at a meeting on December 3, 2009, at which Fifth Third presented its proposal to administer the Plan. The meeting was attended by Ken Genzink, Huizinga, and VanRegenmorter from the Company; and Scott Burke, Kathleen Warren, Brian Geiger, and Claire Larsen, from Fifth Third. Fifth Third's presentation included a description of the administration services the Bank would provide but did not include information about pricing or fees for those services. When Ken Genzink asked about the pricing information and Fifth Third could not produce it, Huizinga interjected with his concerns about Roti and the administration of the Plan. While the parties disagree about exactly what was said during the meeting, it is clear that Huizinga's frustration and anger were evident to everyone attending the meeting, and that his conduct at the meeting exhibited the mercurial demeanor and lack of respect that Huizinga's colleagues had witnessed and complained about from the time he started with the Company.

Ken Genzink left the meeting deeply disturbed by Huizinga's outburst, particularly because it occurred in front of Bank representatives. It was the first time he had personally witnessed the kind of behavior from Huizinga that others had observed throughout the year. Afterwards, he consulted with Roti, his friend and fellow board member, via telephone. Also in the aftermath of the meeting, Ken Genzink looked up a checklist of traits of workplace bullies. The next day, he met with VanRegenmorter over lunch at an out-of-town location. At the meeting, Ken Genzink talked with VanRegenmorter about Huizinga's eruption at the December 3rd meeting. Van Regenmorter confirmed that he knew of similar behavior from Huizinga in the past. Ken Genzink then asked VanRegenmorter to review the bully checklist he had found and say whether any of the traits on the list applied to Huizinga. When VanRegenmorter confirmed that many of the traits on the list did apply to Huizinga, Ken Genzink scheduled another meeting for the following day with

VanRegenmorter and Maxson, another key member of the Executive Team. At that meeting, he asked Maxson to go down the bully checklist. Maxson did so and confirmed that Huizinga exemplified many of the traits on the list that VanRegenmorter had identified the previous day. After further discussion, all three concluded that Huizinga had to go. The topic of the 401k did not come up during either of Ken Genzink's meetings. The Company fired Huizinga the next day, December 6, 2009.

### D. Genzink Steel After Huizinga's Termination

After Huizinga was fired, Genzink Steel experienced several personnel changes that shifted it back to the management dynamic that had existed before Huizinga's tenure as CFO. Within a month of Huizinga's termination, Angeli was reinstated, full-time, to his old position as Genzink Steel's plant manager. Orchard was also invited back to her old job at the Company. And VanRegenmorter--Huizinga's sole ally in his time at Genzink Steel--resigned or retired. In short, the Company's Management Team largely reverted to what it had been before Huizinga joined Genzink Steel. By all accounts, the team culture has returned to Company management and Genzink Steel has succeeded economically.

### E. Post-Termination Legal Proceedings

Following his termination, Huizinga sued Roti, the Company, and Ken and Don Genzink-- Ken in his capacities as President of the Company and Plan trustee, and Don in his capacity as a Plan trustee. Huizinga's amended complaint alleged five counts. Count I alleged that the Genzinks and Ron Roti breached their fiduciary duties to the Plan under ERISA, 29 U.S.C. § 1109, by allowing Roti to recover excessive fees as third-party administrator for the Plan. Count II alleged that Huizinga was discharged by Ken Genzink and the Company for exercising his rights under ERISA,

in violation of 29 U.S.C. § 1140. Count III alleged that Huizinga's termination violated Michigan's Whistleblower Protection Act, Mich. Comp. L. § 15.361 *et seq.* Count IV alleged that Huizinga's firing violated Michigan public policy. Count V alleged that Huizinga's termination was an unlawful retaliatory discharge under ERISA. All of the Defendants counterclaimed against Huizinga, as well. (Answer to Am. Compl., doc. # 16.)

All parties moved for summary judgment on all issues. After a hearing on the motions, the Court dismissed all of the claims except for the breach of fiduciary duty claim against the Genzinks (Count I) and the ERISA retaliatory discharge claim against Ken Genzink and the Company (Count II). After further discovery, Huizinga renewed his motion for summary judgment on his breach of fiduciary duty claim. In the Court's view, the record demonstrated that none of the Defendants had a comprehensive understanding of Roti's fees, and that none could explain the apparent discrepancies in the fee information available. The record disclosed, at a minimum, an unexplained discrepancy between what Roti claimed, on his spreadsheet, to receive, and the higher amounts it appeared from third-party sources he had actually received. Faced with this record, the Court granted Huizinga's renewed motion, ruling that the Genzinks had breached their fiduciary duties as Plan trustees by failing to keep tabs on the fees and other compensation Roti received from the Plan.

The Court's rulings at summary judgment meant that, at trial, only two contested issues remained: (1) the appropriate remedy for the Genzinks' breach of their ERISA fiduciary duty; and (2) the reason for Huizinga's termination, and, in particular, whether Huizinga was fired in retaliation for saying he was going to tell the government about Roti's fees as third-party administrator of the Plan. The Court held a four-day trial in late May on those issues. Having

thoroughly considered the record, the parties' arguments, and the applicable law, the Court is ready to make a decision in this case.

## II. HUIZINGA'S RETALIATORY DISCHARGE CLAIM

Count II of Huizinga's Amended Complaint alleges that Ken Genzink and Genzink Steel fired Huizinga because he threatened to tell the Department of Labor about the improper fees Roti was receiving from the Plan. ERISA § 510, codified at 29 U.S.C. § 1140, makes it "unlawful for any person to discharge . . . a participant or beneficiary for [1] exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for [2] the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." To prove a claim of retaliatory discharge under ERISA, a plaintiff must show that the defendants had a specific intent to violate ERISA. *Schweitzer v. Teamsters Local 100*, 413 F.3d 533, 537 (6th Cir. 2005). Even assuming, for purposes of argument, that Huizinga triggered § 510 protection with statements during the December meeting, the Court finds that Huizinga has not established by a preponderance of the evidence that he was fired for any such statements.

On its face, the timing of Huizinga's termination--just a few days after he allegedly told Ken Genzink and VanRegenmorter that he was going to go to the federal government about the 401k fees--raises a natural suspicion of retaliation. And there was, after all, a real problem with the 401k fees in the Court's view. The testimony at trial, however, emphatically and overwhelmingly demonstrated--and the Court finds as a matter of fact--that it was Huizinga's repeated disrespectful interactions with Genzink Steel personnel and third-party service providers that led to his firing, not anything he said about 401k fees. One after another, past and present Genzink Steel employees and service providers came forward at trial with convincing stories about why they had long disliked or

distrusted Huizinga, or about how he made it uncomfortable for them to work at or for the Company. Their testimony was heartfelt, credible, consistent, and unequivocal. They all painted a picture of Huizinga as a "bad apple," someone who did not fit well with the Company's corporate culture and who did not exhibit the demeanor expected of a Genzink Steel team member. Even VanRegenmorter--the only Company employee who ever appeared to be in Huizinga's corner, and on whom Huizinga relied for favorable character testimony--was at best equivocal at trial about Huizinga's interactions at the Company. Indeed, he testified about multiple occasions when he, personally, was shocked by Huizinga's behavior toward others, or when he had found Huizinga's conduct disconcerting. Far from refuting the Defendants' account, VanRegenmorter's testimony essentially validated what the other Genzink Steel employees said about Huizinga and gave no credence to the notion that Huizinga's protests about the Plan had anything to do with his termination. The overwhelming consistency of all the employees' testimony, coupled with the established history of management's dislike of Huizinga and the repeated efforts to have him removed as CFO--or at least to curb his powers--make it clear, as a matter of fact, that Huizinga was fired because he was a poor fit at Genzink Steel, not because of any reports he threatened to make.

Indeed, the record does not even establish that Huizinga threatened, at the December 3 meeting, to make a report to the Department of Labor. Huizinga says he did, but there is nothing to corroborate this. VanRegenmorter has no memory of what Huizinga said at the meeting, nor does Warren. Larson and Ken Genzink, moreover, affirmatively testified that Huizinga did not make any such threat at the December 3 meeting. Huizinga himself certainly took no action in the immediate aftermath of the meeting to report to the Department of Labor. The Court concludes that Larson and Ken Genzink are telling the truth about what happened at the meeting, and that the 401k only came

up in the context of Huizinga's individual account statement. In that context, Huizinga's complaints were entirely about his personal dissatisfaction with his investment results. The Court does not find any credible evidence that his complaints went beyond that scope. Indeed, when VanRegenmorter, Genzink, and Maxson testified about the meetings leading up to Huizinga's termination, all agreed that the topic of the 401k and any fees associated with it never came up for discussion. The exclusive focus of the discussions was Huizinga's established pattern of bullying behavior.

As a matter of law, a plaintiff cannot maintain an ERISA retaliatory discharge claim unless he shows that the defendant knew the plaintiff had taken or was about to take some action protected by ERISA. See 29 U.S.C. § 1140; *Thaddeus-X v. Blatter*, 175 F.3d 378, 387 n.3 (6th Cir. 1999) (en banc) ("'[T]he defendant must have known about the protected activity in order for it to have motivated the adverse action."). Since the Court has concluded that Huizinga did not take or threaten to take any such action, let alone that Ken Genzink or the Company were aware that he might take protected action, the § 510 protections are not in play. See *Hamilton v. Starcom Mediavest Grp., Inc.*, 522 F.3d 623, 628 (6th Cir. 2008) ("As an initial matter, of course, an employee's protected activities will be the cause of an employer's retaliatory conduct only where the employer knew of those protected activities.").

Accordingly, Huizinga has not established his retaliatory discharge claim in Count II of his Amended Complaint.

## III.  REMEDIES FOR HUIZINGA'S BREACH OF FIDUCIARY DUTY CLAIM

At summary judgment, the Court concluded that Ken and Don Genzink were liable for breaching their ERISA fiduciary duties as trustees of the Plan. Specifically, the Court determined

that the Genzinks had failed to keep track of what the Plan was paying Roti as third-party administrator. (See Op. & Order, doc. # 155, at 16.) As the Court noted in its order,

> As the case law and ERISA itself makes clear, being a fiduciary for an employee benefits plan is not a task to be taken lightly. One of the most fundamental requirements for a fiduciary is to ensure that a plan receives all funds to which it is entitled, so that those funds can be used on behalf of participants and beneficiaries. This duty necessarily requires a fiduciary to know what the Plan is paying to whom and for what purpose. As applied here, it requires the fiduciaries to understand what Mr. Roti is receiving directly and indirectly by having the Plan follow his advice to place the assets with UNIFI. The summary judgment record leaves no reasonable conclusion possible but that the Genzinks failed to do that in this case. In fact, it appears they did not really see the compensation question as important at all, choosing instead to trust Mr. Roti because, among other things, Mr. Roti already functioned as a trusted advisor to the Genzink family and Genzink Steel. Actually, Mr. Roti's work on behalf of the family and the Company made it all the more critical in this case for the Genzinks as fiduciaries to understand exactly what Mr. Roti was receiving related to his role with the Plan. The Genzinks failed to discharge this fiduciary duty.

(*Id.* at 16-17.)

Having found the Genzinks liable on Huizinga's breach of fiduciary duty claim, the Court still faced the question of what remedy the Genzinks owed Huizinga and other plan participants. The framework for answering that question is set out by ERISA § 502, which provides, *inter alia*, that "the Secretary [of Labor], . . . a participant, beneficiary or fiduciary" may bring a civil action "for appropriate relief [for a plan fiduciary's breach of fiduciary duty] under section 1109 of this title." 29 U.S.C. § 1132(a)(2). In deciding what constitutes "appropriate relief" in this case, the Court has recourse to the broad, equitable powers granted to it under ERISA. See, e.g., *Authier v. Ginsberg*, 757 F.2d 796, 801-02 (6th Cir. 1985) (observing that, "in the sections considering the enforcement provisions of ERISA . . . Congress intended to provide the full range of legal and equitable remedies"); *Solis v. Malkani*, 638 F.3d 269, 274 (4th Cir. 2011) ("A federal court enforcing fiduciary

obligations under ERISA is given broad equitable powers to implement its remedial decrees.");
*Sommers Drug Stores Co. Emp. Profit Sharing Trust v. Corrigan Enters., Inc.*, 793 F.2d 1456, 1463 (5th Cir. 1986) (noting that equitable relief under ERISA has been interpreted to include "all of the kinds of relief available to restore the plaintiff's losses or protect him from future harm--recission, removal of a trustee, appointment of a receiver, and other similar relief").

### A.    Restitution

#### 1.    The legal basis for an equitable award

The proofs at trial established by a preponderance of the evidence not only that the Genzinks failed to keep track of Roti's compensation from the Plan, but also that the Plan was incurring substantially more in fees and other charges than what Roti and the Genzinks claimed and disclosed. A careful exercise of fiduciary duty would have prevented those unjustified and excess payments. Accordingly, restitution from the fiduciaries, of the excess payments they allowed the Plan to make beyond those disclosed by Roti and the Genzinks, is appropriate.

The Genzinks say Huizinga is not entitled to recover money for the Plan for two legal reasons. Neither of those reasons is ultimately convincing. First, the Genzinks argue that, under 29 U.S.C. § 1132(a)(3), Huizinga is only entitled to equitable relief, and that money damages are not a form of equitable relief. That argument mistakenly assumes, however, that any award of money is an award of money damages. Of course, not every award of money qualifies as damages. Restitution, for example, requires payment of money, but has long been understood to be an equitable remedy. See, e.g., *Schwartz v. Gregori*, 45 F.3d 1017, 1022-23 (6th Cir. 1995) (holding that back pay and front pay are equitable remedies available under ERISA). As the Sixth Circuit has explained, the difference between restitution and money damages is that restitution involves

14

repayment of "particular and traceable funds," whereas money damages are typically paid out of a "general fund." See *Alexander v. Bosch Automotive Sys., Inc.*, 232 F. App'x 491, 500-01 (6th Cir. 2007). The whole point of restitution, in other words, is to facilitate the return of particular, identifiable funds to their rightful owners. *Id.* In this case, there is no question that particular monies flowed from the Plan to Roti and other non-participants, and based on the Court's liability finding, a portion of these monies flowed in breach of the Genzinks' fiduciary duties. Those monies are identifiable and traceable and, therefore, Huizinga's claim to have them returned to the Plan is cognizable under § 1132(a)(3) as a claim for equitable, not legal, relief.

The Genzinks' next argument is that Huizinga may not sue to recover on behalf of the Plan because, to have standing to recover on behalf of a plan or its participants, an individual participant must first take steps to proceed as a representative of the entire plan or all of the plan's participants. For this proposition, they cite the Second Circuit's decision in *Coan v. Kaufman*, 457 F.3d 250 (2d Cir. 2006). While the *Coan* Court expressly declined "to delineate minimum procedural safeguards that [ERISA § 502(a)(2)] requires in all cases," it did say that, to proceed on behalf of a plan or other plan participants, a plaintiff-participant must take "[some] steps to permit the court to safeguard the interests of others or the court's proceedings." *Coan v. Kaufman*, 457 F.3d 250, 262 (2d Cir. 2006). The *Coan* Court's concern was that, unless a plaintiff-participant did something to safeguard others' interests, there would be a risk that: (1) the plaintiff would reach a settlement benefitting him but not the plan as a whole; (2) it might be difficult to distribute any recovery, especially if the plan at issue was no longer in existence; and (3) claim or issue preclusion would prejudice other participants in subsequent claims. *Id.* at 261-62.

The Sixth Circuit has never considered *Coan*'s requirement that a participant-plaintiff affirmatively do something to proceed on behalf of a plan or other plan participants. Other courts, however, have rejected the rule from *Coan*, reasoning that ERISA's language imposes no such requirement. See, e.g., *Blankenship v. Chamberlain*, 695 F. Supp. 2d 966, 972 (E.D. Mo. 2010) ("ERISA section 502(a)(2) . . . provides that '*a* participant, beneficiary or fiduciary' of an ERISA plan may bring a civil suit to establish the personal liability of a plan fiduciary to the plan for breach of fiduciary duty."); *Waldron v. Dugan*, No. 07-C-286, 2007 WL 4365358, at *6 (N.D. Ill. Dec. 13, 2007) ("[S]ection 502(a)(2) expressly grants the right to bring fiduciary claims to 'participants,' and does not appear to require them to sue derivatively or to use any other special procedural devices to represent absent parties."). Moreover, these courts have reasoned, the concerns expressed in *Coan* simply do not apply in cases, like Huizinga's, where (1) the plaintiff seeks to recover for the plan as a whole, (2) the plan is still in existence, and (3) any preclusive effect may be determined in later suits, in accordance with the preclusion doctrines themselves. See *Blankenship*, 695 F. Supp. 2d at 973-74. At bottom, these courts have said, the sole concern is whether the plaintiff will adequately represent the parties on whose behalf he is attempting to recover.

Here, the Court concludes that Huizinga has satisfied the requirements for bringing a § 502(a)(2) claim on behalf of the other Plan participants. In the first place, he is a Plan participant, and he is seeking to recover for the Plan as a whole. These are the only requirements on the face of the statute, itself. Moreover, he has done an adequate job of demonstrating losses, not just to his account, but across the entire Plan. Because of the Court's ruling limiting any recovery in this case to the time Huizinga himself was a participant, individuals with claims stretching back farther than Huizinga's unquestionably remain free to bring suit to recover for any earlier losses they sustained

as a result of the Genzinks' breach of fiduciary duty. Furthermore, none of the concerns from *Coan* are present here. There is no risk of a self-serving settlement because, in his breach of fiduciary duty claim, Huizinga seeks to recover only on behalf of the Plan as a whole. Because the Plan is still in existence, it is not likely there will be any serious problems disbursing the money back into the Plan and among its participants according to the Plan's terms. And as for the possibility of preclusion in future litigation, the preclusion doctrines themselves contain adequate safeguards--for example, the requirement of privity in some cases, and the requirement that a particular issue have been fully and fairly litigated before issue preclusion applies. Huizinga is, thus, an adequate representative of the Plan and its participants, especially since there is nothing here to suggest that the absence of other participants as parties prejudices anyone.

### 2. Amount of restitution

The question remains: what is the proper restitution amount? The Genzinks complain that Huizinga's theory of damages is insufficiently precise to support an award, even if one is legally permissible. The Court disagrees. At the outset, there is no requirement that an equitable remedy be inch perfect. To the contrary, precedents establish that courts have broad powers in determining and fashioning equitable remedies, especially in cases where a muddled or incomplete record does not allow for a precise calculation of the amount owed. See, e.g., *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 401 U.S. 1, 15 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."); *S.E.C. v. Bluestein*, No. 09-13809, 2013 WL 1759091, at *4 (E.D. Mich. Mar. 7, 2013) ("Because disgorgement is an equitable remedy, and because a precise calculation may be impossible, it need only be a reasonable approximation of profits causally

connected to the violation.") (quotations omitted). In this case, Huizinga has proceeded on the most complete record available, particularly given Roti's obfuscation and the Genzinks' inability to produce more meaningful data about Plan expenditures. As more fully detailed below, that record is sufficient to establish a restitution amount by a preponderance of the evidence.

It makes no difference that Huizinga proved damages using his own calculations, rather than by means of an expert. Nothing about his claim was so technical as to be beyond someone of his accounting acumen. Furthermore, there is no requirement that every calculation in a case like this needs to be established or verified by an expert, particularly when the Court is in a position to examine for itself the bases for the calculations. Accord *Strong v. Valdez Fine Foods*, --- F.3d ----, 2013 WL 3746097, at *1 (9th Cir. July 18, 2013) (Kozinski, C.J.) ("Perhaps we've become too expert-prone."); *id.* at *3 ("The Federal Rules of Evidence permit an expert to provide his opinion if 'the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.' If the matter testified to is within the knowledge of jurors, we've held expert testimony is not appropriate."). Huizinga possessed the training and skill to understand the numbers and to present them in a coherent and rational way to the fact-finder.

Moreover, to the extent the Genzinks wanted to present an alternative theory of damages--one they felt was more correct--there was nothing at trial to keep them from doing so. The Court found the Genzinks liable on Huizinga's breach of fiduciary duty claim long ago and, since that day, the Genzinks have known they were at risk for an equitable remedy that could include restitution. And yet, at trial, they did not present a single witness to explain their theory (if they have one) about how restitution should be calculated in this case. They cannot now be heard to complain when the Court

uses Huizinga's suggested method of calculation as the primary basis for the award, especially when that method is based largely on data from the same spreadsheet the Genzinks used for so many years in ways that prevented other companies from competing to be the Plan's third-party administrator. In sum, Huizinga's theory of restitution is appropriate and supported by the figures available in this case. The Genzinks have shown no reason to undercut it at this stage.

### 3.     The calculation

The basic measure of restitution in this case is the difference between what the Genzinks and Roti say the Plan was paying in compensation and fees, and the higher compensation amounts actually paid by the Plan based on available third-party records. The starting point for calculating this number is the spreadsheet Roti kept--and the Genzinks used--ostensibly to track Plan costs and compare his administration of the Plan with possible alternatives. Throughout the litigation, the Defendants maintained that Roti's spreadsheet is the one document that defined the fees paid by the Plan, including all compensation that Roti supposedly charged as third-party administrator to the Plan. The Genzinks repeatedly argued that the spreadsheet contained all of the information they needed to do their jobs as trustees of the Plan, and that it showed Roti was the best deal for the Plan. Huizinga, in contrast, insisted that shortcomings in the spreadsheet made clear that the Genzinks could not have fulfilled their fiduciary duties by relying exclusively on the spreadsheet, and the Court so found. The spreadsheet was so central that there was a fight about whether the Genzinks would disclose it to the Court at all. After the Genzinks produced it, they still could not explain all the information on it, how the spreadsheet worked, or why certain information was omitted. Among other things, the spreadsheet did not account for what little information Huizinga was able to obtain from third-party sources about the actual fees charged and compensation received by Roti himself.

The spreadsheet controversy was a major reason why the Court entered summary judgment for Huizinga on his breach of fiduciary duty claim: the Genzinks had a fiduciary duty to know what the Plan was paying in compensation and fees. In relying exclusively on Roti's own spreadsheet for that information without obtaining third-party verification, they breached that duty, causing the Plan to pay excess fees. Rather than investing the time and effort to keep tabs on what the Plan was paying, the Genzinks effectively took Roti at his word and even went so far as to actively deflect other potential third-party administrators--including Fifth Third Bank--on the now discredited theory that Roti offered a better deal for Plan participants. The facts now show by a preponderance that the Plan suffered as a result.

At trial, the Genzinks suggested for the first time that the spreadsheet was incomplete--that it was never meant to disclose all the fees or compensation the Plan was paying. Before that, they cited it again and again as an authoritative, definitive account of the Plan's fees, and as the exclusive means of discovering what fees were being charged to administer the Plan, and for company alternatives. Accordingly, the Court finds that Roti's spreadsheet is the baseline for determining what fees the Plan was, in the Genzinks' own view, authorized to pay. The spreadsheet shows the total fees for the Roti-administered package were only .72% (or 72 basis points) of the Plan's entire asset balance. In fact, it is clear the Plan paid considerably more than this, including substantial additional payments to Roti himself. By failing to exercise their fiduciary duty, the Genzinks permitted the Plan to pay the excess, undisclosed fees.

The appropriate measure of restitution in this case is however much above the .72% the Plan actually paid in fees and other expenses. To calculate that amount, the Court must look at total plan assets, fund level expenses (i.e., the expenses charged by each particular investment fund in the

plan), and plan level charges (i.e., costs charged at the plan level, not the individual fund level). (See Pl.'s Trial Ex. 23 (showing asset balances in each fund); Pl.'s Trial Ex. 52 (showing charges associated with each fund); Pl.'s Trial Ex. 42 (showing plan level expense reports).) Evidence from trial consistently showed total Plan assets at about $7 million. (See Spreadsheet, Defs.' Ex. FF (estimating assets at $7 million); see also Pl.'s Trial Ex. 23 (estimating assets at $7.2 million); Pl.'s Trial Ex. 52 (estimating assets at $7 million).) The evidence also showed that actual annual expenses at the fund level were about $80,000, or 1.15% for fund level charges. (See Pl.'s Trial Ex. 23, at 1-2 (showing investment balances in each fund); Pl.'s Trial Ex. 52, at 27-30 (showing expenses for each fund).) Finally, at the plan level, the annual charges consisted of about $51,000 in commissions annually paid to Roti, plus an overall .20% (or 20 basis point) charge on at least the $5.4 million in total Plan funds held by UNIFI, or about $10,800. (Pl.'s Trial Ex. 42, at 15-16.) The total annual plan level charges, then, are $61,800, about .88% (88 basis points) of the full Plan assets of $7 million.[5] (See Pl.'s Trial Ex. 42, at 15.) The total charge, then, is 2.03% (or 203 basis points) of total plan assets, almost three times the .72% Roti listed on the spreadsheet. Thus, the reimbursement owed by the Genzinks amounts to 1.31% (or 131 basis points) of the plan balance for each applicable year--the difference between the disclosed fees of 72 basis points, and the actual fees of 203 basis points.

---

[5] Huizinga suggested a somewhat higher plan level charge of 1.14%, but this was based on the ratio of the reported plan level commission and expenses divided by only those plan assets held by UNIFI (approximately $5.4 million). The more appropriate--and somewhat lower--ratio is the total plan level commissions and fees divided by total Plan assets (approximately $7 million), which is the value the Court is using.

Again using the $7 million asset balance figure from the spreadsheet, the total amount owed comes out to be $91,700 for each year covered by Huizinga's claim, or $7,642 per month.[6]

The last component is figuring out the length of the period for which restitution is owed under Huizinga's claim. Huizinga seeks restitution for the full limitations period of six years, but that would allow him to recover for himself and for others for years during which he was not, himself, a participant in the Plan. The Court finds that would be inconsistent with his representative role under ERISA § 502. The record shows that Huizinga became a Plan participant on March 1, 2009. (See Pl.'s Ex. 50, at 1 (explaining criteria for becoming participant in Plan).) He remained a participant in the Plan from that point through August 1, 2012, the date Roti was replaced as the Plan's third-party administrator. (See Greenleaf Notice, Pl.'s Ex. 3, at 1.) That is a span of 42 months during which the Genzinks allowed the Plan to incur fees and expenses significantly in excess of the disclosed 72 basis points. At $7,642 per month, the total amount of restitution the Genzinks owe to the Plan comes to $320,964. That amount, in turn, is to be distributed to each qualifying participant's Plan account in proportion to the participant's total assets in the Plan.[7]

---

[6] As noted earlier, the Genzinks chose not to provide an alternative restitution theory, relying instead on the claim that no restitution was due or proper. This was a tactical choice the Genzinks were free to make, but it leaves the record devoid of any evidence that might reasonably have limited the restitution to some lower amount. As the record stands, and based on the Court's findings of fact, the total cost of the Roti-administered Plan was only 72 basis points, but the actual charges incurred by the Plan – at the combined fund level and the plan levels – were much higher than that amount. In the absence of any competing defense theory or proofs on the issue, the proper measure of restitution is the entire excess amount.

[7] As a matter of equity, neither Don nor Ken Genzink should benefit from their breaches of fiduciary duty. Accordingly, their individual accounts in the Plan should not receive any share of the restitution. Instead, that amount of restitution attributed to their account balances should be allocated, pro rata, among all other Plan participants.

### B. Injunctive Relief

Restitution is not the only remedy warranted in this case. Injunctive relief is also appropriate to prevent future harm of a similar nature. See, e.g., *Sommers Drug Stores Co. Emp. Profit Sharing Trust v. Corrigan Enters., Inc.*, 793 F.2d 1456, 1463 (5th Cir. 1986) (noting that equitable relief under ERISA has been interpreted to include "all of the kinds of relief available to restore the plaintiff's losses *or protect him from future harm*--recission, removal of a trustee, appointment of a receiver, and other similar relief") (emphasis added).

First, given the conflicted relationship between Roti and the Plan, it is entirely reasonable that the Plan be permanently enjoined from hiring Roti, or any company associated with Roti, as a compensated service provider for the Plan. The Plan has already terminated Roti for its own, undisclosed reasons, but Roti remains a board member of the Company, and presumably a friend of the Genzinks. He may also still be a personal service provider to the Genzinks. An injunction keeping Roti away from any possibility of compensated service for the Plan is well within the Court's broad equitable powers under ERISA. See *Landgraff v. Columbia/HCA Healthcare Corp.*, 30 F. App'x 366, 368 (6th Cir. 2002) ("The equitable remedy of removal of a fiduciary is authorized by statute.").

Second, and based on the same authority, the Court concludes that the Plan must also be enjoined from hiring any compensated service provider--Roti or otherwise--who has a seat on the Genzink board. The potential for conflicts of interest in those circumstances is considerable and the risk easily averted. Just as the monetary remedy in this case will restore the participants' past losses, this injunction will protect participants from the risk of similar harms in the future.

Third, the need to supervise the restitution relief ordered by the Court, and the need to purge any lingering doubts about the fiduciary supervision of the Plan, call for appointment of an independent fiduciary for the Plan, at least on a temporary basis. The Court directs the Plan to retain an independent fiduciary approved by the Court for period of at least two complete Plan years. Any party to the case may nominate a fiduciary to the Court not less than 30 days from the date of this Order. With or without party nomination, the Court will appoint an independent fiduciary not later than 60 days from the date of this Order. The independent fiduciary will be responsible for overseeing the proper implementation of the restitution remedy among Plan participants; for reviewing the investment and fee structure of the Plan; and for reporting to the Court, in a sealed filing available only to the parties and the Court, the nature of its activities. The report is due within thirty days of the due date for the Plan's form 5500 filing. After the independent fiduciary serves not less than two complete Plan years, the Plan may seek permission of the Court to terminate this aspect of the injunctive relief. The individual fiduciary Defendants, not the Plan itself, shall be responsible for payment of the independent fiduciary's fees.

### C. Attorney Fees

Huizinga also requests that the Genzinks pay his attorney's fees in this matter. Courts have broad discretion to award attorney's fees in ERISA action. See 29 U.S.C. § 1132(g)(1) ("In any action under this subchapter . . . by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."). In this circuit, the general rule is that an award of attorney's fees is appropriate when a party prevails on an ERISA claim. *Cattin v. Gen. Motors Corp.*, 955 F.2d 416, 427 (6th Cir. 1992); see also *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 694 (1983) (party in ERISA case may be entitled to attorney's fees where he has had

at least "some degree of success on the merits"). Given Huizinga's success on his breach of ERISA fiduciary duty claim, he is entitled to reasonable attorney's fees tied to his success on his ERISA fiduciary duty claim.

**ACCORDINGLY, IT IS ORDERED** that Ken Genzink and Don Genzink pay $320,964 in restitution to the Plan, to be distributed across each qualifying participant's Plan account in proportion to the participant's total assets in the plan from March 1, 2009 to July 31, 2012.

**IT IS FURTHER ORDERED** that the Plan is **PERMANENTLY ENJOINED** from hiring Ron Roti, or any company associated with Roti, as a compensated service provider for the Plan.

**IT IS FURTHER ORDERED** that the Plan is **PERMANENTLY ENJOINED** from paying compensation to any service provider for the Plan who has a seat on Genzink Steel's board of directors, or whose principal has a seat on Genzink Steel's board of directors.

**IT IS FURTHER ORDERED** that the Plan retain the services of an independent fiduciary to serve as fiduciary for the Plan on the terms specified in this Order.

**IT IS FURTHER ORDERED** that Ken Genzink and Don Genzink pay Charles Huizinga's reasonable attorney's fees for his ERISA fiduciary duty claim in this matter.

**IT IS FURTHER ORDERED** that Count I of Charles Huizinga's Amended Complaint (doc. # 17) is **DISMISSED** with prejudice.

**JUDGMENT WILL ENTER ACCORDINGLY.**


Dated:    August 23, 2013          /s/ Robert J. Jonker
                                   ROBERT J. JONKER
                                   UNITED STATES DISTRICT JUDGE